KRAFT POWER CORPORATION *vs.* SHARON F. MERRILL, executrix,[1] & another.[2]

Middlesex. September 4, 2012. - January 14, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Corporation,* Corporate disregard. *Survival of Action. Practice, Civil,* Survival of action. *Contract,* Performance and breach. *Uniform Fraudulent Transfer Act. Consumer Protection Act,* Unfair act or practice, Damages. *Fraud.*

A Superior Court judge, in determining whether claims premised on a theory of corporate disregard survived the death of the alleged wrongdoer, a corporate principal, such that his estate could be sued by the plaintiff, erred in dismissing the plaintiff's claims for breach of contract, for remedies under the Uniform Fraudulent Transfer Act that were premised on a contractual right to payment, and for violations of G. L. c. 93A premised on the decedent's actions in undermining the plaintiff's right to payment under the contract, where such claims were contractual, not tortious, in nature and therefore survived the death of the decedent [147-157]; however, the judge correctly dismissed the plaintiff's fraud claim that was based on an allegation that the decedent fraudulently induced a contractual relationship, where such a claim did not survive under either the survival statute, G. L. c. 228, § 1, or at common law [160-161].

This court concluded that multiple damages may not be sought under G. L. c. 93A when the defendant has died, given that the goals served by such damages (i.e., punishment and deterrence) can no longer be achieved. [157-159] LENK, J., dissenting in part, with whom SPINA and BOTSFORD, JJ., joined.

CIVIL ACTION commenced in the Superior Court Department on June 13, 2008.

A motion for judgment on the pleadings was heard by *Leila R. Kern,* J., and entry of separate and final judgment was ordered by *S. Jane Haggerty,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

[1] Of the estate of John J. Marino.
[2] Integrated Systems & Service, LLC.

*Paul Marshall Harris* (*Sara A. Decatur* with him) for the plaintiff.

*Mark S. Furman* (*Emily C. Shanahan* with him) for Sharon F. Merrill.

DUFFLY, J. This case requires us to decide whether certain claims premised on a theory of corporate disregard survive the death of John J. Marino, such that his estate may now be sued by the plaintiff, Kraft Power Corporation (Kraft).

Because the doctrine of corporate disregard is not a cause of action but an equitable doctrine by which an act or obligation of a corporation giving rise to a cause of action may be charged to a principal of the corporation, we look to the underlying claims to decide whether a cause of action survives.[3] We conclude that Kraft's claims for breach of contract; for remedies under the Uniform Fraudulent Transfer Act, G. L. c. 109A (UFTA); and for violations of G. L. c. 93A should not have been dismissed, because all three claims are contractual in nature. Since fraud is a tort not enumerated in G. L. c. 228, § 1, Kraft's fraud claim does not survive Marino's death, and properly was dismissed. Because Kraft's unjust enrichment claim is premised on the allegation that Sharon F. Merrill, as executrix of Marino's estate (estate), is currently retaining funds that belong to Kraft, neither the doctrine of corporate disregard nor the doctrine of survival have any application; this claim should not have been dismissed.

*Background and prior proceedings.* Marino was the sole shareholder, sole director, president, and treasurer of Power Wiring & Emergency Response Inc. (Power Wiring). Kraft sold equipment to Power Wiring, which failed to pay Kraft. Kraft eventually obtained a default judgment against Power Wiring for breach of contract, in the amount of $259,417.47, but was unable to enforce the judgment because Power Wiring had no assets. Marino died before entry of the default judgment, and Kraft brought an action in the Superior Court against Merrill, as

---

[3]Because of the bases on which Kraft Power Corporation (Kraft) relied in its pleadings, and the manner in which it has argued the issue before us, whether certain of Kraft's claims survive depends on whether Kraft can pierce the corporate veil of Power Wiring & Emergency Response Inc. (Power Wiring). We do not suggest that, had the pleadings been drafted differently, these causes of action would necessarily require that a plaintiff be able to pierce the corporate veil. See note 12, *infra.*

executrix of the estate; Merrill in her individual capacity; and Integrated Systems & Service, LLC (Integrated).[4] Kraft's complaint in essence alleges that Marino was responsible for the contractual obligations of Power Wiring because he abused the corporate form in that he caused Power Wiring, a corporation over which he exercised pervasive control, to become insolvent by transferring all of its assets to Integrated, another corporation owned and controlled by Marino; used Power Wiring and Integrated as sham corporations for his personal benefit; and used Integrated to deny Kraft the means to enforce its judgment against Power Wiring. Kraft's complaint asserts claims against the estate based on breach of contract, the UFTA, violations of G. L. c. 93A, unjust enrichment, and fraud.

The defendants filed a joint motion for judgment on the pleadings, raising only the narrow issue whether the claims against the estate must be dismissed because they do not survive Marino's death. The defendants argued that none of the claims survived, as each claim arises from fraudulent acts or misrepresentations made by Marino. Concluding that the doctrine of corporate disregard did not transform the underlying actions into contract actions, and that the doctrine could not be extended "to establish survivability of a claim that would otherwise be extinguished upon the death of a party," a Superior Court judge dismissed all claims against the estate.

A separate and final judgment, pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), issued as to Kraft's claims against the estate, thus permitting Kraft's appeal to go forward. After Kraft's appeal was entered in the Appeals Court, we transferred the case on our own motion.

*Discussion.* We review the allowance of a motion for judgment on the pleadings de novo, based on our review of the allegations in the complaint. See *Commonwealth* v. *Fremont Inv. & Loan*, 459 Mass. 209, 212 (2011); *Wheatley* v. *Massachusetts Insurers Insolvency Fund*, 456 Mass. 594, 600-601 (2010). We

---

[4]This appeal concerns only Kraft's claims against Merrill as executrix of Marino's estate. The proceedings against Integrated Systems & Service, LLC (Integrated), have been stayed pending resolution of this appeal. The parties filed a joint stipulation dismissing the action against Merrill in her individual capacity.

begin by examining the nature of the doctrine of corporate disregard and its relationship to an underlying cause of action.

1. *Piercing the corporate veil.* It is a general principle of corporate law "deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods,* 524 U.S. 51, 61 (1998), quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 193 (1929). See *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* 353 Mass. 614, 618 (1968), quoting Douglas & Shanks, *supra.* This general rule, which also applies to defeat claims against corporate principals for a corporation's acts, gives way when circumstances arise that provide an "occasion 'to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries.' " *Id.,* quoting *M. McDonough Corp.* v. *Connolly,* 313 Mass. 62, 65-66 (1943). See *Scott* v. *NG US 1, Inc.,* 450 Mass. 760, 766-767 (2008), citing *Hanson* v. *Bradley,* 298 Mass. 371, 381 (1937) (equitable doctrine of corporate disregard exercised "only for the defeat of fraud or wrong, or the remedying of injustice"). In such circumstances, the corporate veil can be pierced, as a tool of equity, to disregard the corporation's existence and impose liability on individual principals. See *United States* v. *Bestfoods, supra* at 64.

Here, we consider whether a cause of action survives the death of the alleged wrongdoer, a corporate principal, when the plaintiff attempts to bring a cause of action against the corporate principal by piercing the corporate veil. Once the corporate veil is pierced, the individual defendant and the corporation become "one for all purposes." *United States* v. *Lehigh Valley R.R.,* 220 U.S. 257, 272 (1911). We therefore conclude that the analysis is no different when a cause of action is premised on piercing the corporate veil than when it has been brought directly against an alleged wrongdoer. This is because the doctrine is not itself a cause of action but "an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. 546, 555 (2000), citing *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 620.

Litigants attempt to pierce a corporate veil as a "means of imposing liability on an underlying cause of action such as a tort or breach of contract."[5] 1 W.M. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.10 (rev. ed. 2006). See *Peacock v. Thomas*, 516 U.S. 349, 354 (1996), quoting 1 C. Keating & G. O'Gradney, Fletcher Cyclopedia of the Law of Private Corporations § 41, at 603 (perm. ed. 1990) (piercing corporate veil is not itself independent ERISA cause of action "but rather is a means of imposing liability on an underlying cause of action"). Therefore, to determine whether a cause of action survives the death of a party, courts must look beneath the corporate veil to the underlying substantive claim for which a plaintiff seeks to impose a corporation's liability on an individual shareholder.[6]

2. *Survival of actions.* We turn next to a discussion of the Massachusetts survival statute, G. L. c. 228, § 1,[7] which provides

---

[5]Other jurisdictions have held also that piercing a corporate veil is not a cause of action. See, e.g., *International Fin. Serv. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004); *Leek v. Cooper*, 194 Cal. App. 4th 399, 418-419 (2011); *Swinerton Bldrs. v. Nassi*, 272 P.3d 1174, 1177 (Colo. App. 2012); *Turner Murphy Co. v. Specialty Constructors, Inc.*, 659 So. 2d 1242, 1245 (Fla. Dist. Ct. App. 1995); *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002); *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993); *Drury Dev. Corp. v. Foundation Ins. Co.*, 380 S.C. 97, 103-104 (2008); *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 145 (Tenn. Ct. App. 2003); *Matthews Constr. Co., Inc. v. Rosen*, 796 S.W.2d 692, 693 n.1 (Tex. 1990). We are aware of no case that reaches a different conclusion.

[6]Among several considerations whether to disregard the corporate form is "use of the corporation in promoting fraud." *Scott v. NG US 1, Inc.*, 450 Mass. 760, 768 (2008), quoting *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 n.19 (2000). Corporate veils are rarely pierced. See *id.* That there are allegations of fraudulent conduct in the complaint that support piercing a corporate veil does not mean, as the defendants argue, that "the gist of Kraft['s] claim to pierce the corporate veil is tortious in nature" and therefore does not survive the death of a party. That argument assumes, incorrectly, that the doctrine is an independent cause of action. The equitable doctrine may be employed to hold Marino liable for certain breaches or wrongs, even after his death, only so long as the underlying claims survive under applicable law.

[7]General Laws c. 228, § 1, provides:

> "In addition to the actions which survive by the common law, the following shall survive: —

> "(1) Actions under chapter two hundred and forty-seven;

> "(2) Actions of tort (*a*) for assault, battery, imprisonment or other damage to the person; (*b*) for consequential damages arising out of

for the survival of enumerated tort actions, "[i]n addition to the actions which survive by the common law."

At common law, actions based on contract survived the death of a party. See *Gasior* v. *Massachusetts Gen. Hosp.*, 446 Mass. 645, 649 (2006); *Rendek* v. *Sheriff of Bristol County*, 440 Mass. 1017, 1017 (2003); *McStowe* v. *Bornstein*, 377 Mass. 804, 806-807 (1979). By contrast, tort actions did not survive. See *Pine* v. *Rust*, 404 Mass. 411, 417 (1989), citing *Putnam* v. *Savage*, 244 Mass. 83, 85 (1923).[8] The Legislature enacted the survival statute "to abrogate the common law rule established in Massachusetts that tort actions were personal and, thus, did not survive the death of either the injured party or the wrongdoer."[9] *Sheldone* v. *Marino*, 398 Mass. 817, 818 (1986). Subsequently, a cause of action survives if it falls within the list of torts enumerated in G. L. c. 228, § 1, or if it is "deemed an action that survives 'by the common law.' " *Gasior* v. *Massachusetts Gen. Hosp.*, *supra* at 649, citing G. L. c. 228, § 1. See *Rendek* v. *Sheriff of Bristol County*, *supra* at 1017 (to survive death of party, claim not enumerated in G. L. c. 228, § 1, "must be deemed a cause of action that survives by common law").

When assessing whether a claim is contractual or tortious in

injury to the person and consisting of expenses incurred by a husband, wife, parent or guardian for medical, nursing, hospital or surgical services in connection with or on account of such injury; (*c*) for goods taken or carried away or converted; or (*d*) for damage to real or personal property; and

"(3) Actions against sheriffs for the misconduct or negligence of themselves or their deputies."

[8]"The original reasons for the nonsurvival of torts at common law have been largely obscured in antiquity." *Harrison* v. *Loyal Protective Life Ins. Co.*, 379 Mass. 212, 216 (1979).

[9]The survival statute has its roots in St. 1805, c. 99, § 2, which provided that "actions for the malfea[s]ance or misfea[s]ance of any Sheriff or any of his Deputies, may be sued against the executors or administrators of such Sheriff, in the same manner as if the cause of such action survived against the Executor or Administrator at the common Law." It was in 1836, however, that the modern survival statute was enacted. See Rev. St. (1836), c. 93, § 7. That statute provided: "In addition to the actions, which survive by the common law, the following shall also survive . . . actions of replevin and trover, actions of trespass for assault, battery, or imprisonment, or for goods taken and carried away, and actions of trespass and trespass on the case for damage done to real or personal estate."

nature to determine if it survives under common law, "[w]e have looked with disfavor on rigid procedural distinctions between contract and tort and are more concerned today with substance than with form." *McStowe* v. *Bornstein, supra* at 808. For example, we held in *Gasior* v. *Massachusetts Gen. Hosp., supra* at 650-651, that an employee's claim for wrongful termination under G. L. c. 151B, § 4 (16), survived his death because his claim was, in substance, a claim that his employer committed a breach of an implied contractual term of the at-will employment relationship.[10]

3. *Whether the plaintiff's claims survive.* We recite in some detail the allegations of the complaint, accepting all well-pleaded facts as true. See *Wheatley* v. *Massachusetts Insurers Insolvency Fund, supra* at 596.

In 2005, Kraft agreed to sell commercial generator equipment to Power Wiring. Marino exercised pervasive control over Power Wiring when it contracted to buy Kraft's equipment. At the time Power Wiring entered into the contract with Kraft for the purchase of the equipment, Marino had caused Power Wiring to become insolvent, and it could not pay for the equipment. Power Wiring resold the equipment to a third party, which paid Power Wiring in full for the equipment and its installation. Rather than paying the proceeds of the resale to Kraft, Marino used these funds to pay personal obligations.

Marino caused Power Wiring to remain insolvent and to file for receivership in order to defraud its creditors, including Kraft. By causing Power Wiring to file for receivership under Massachusetts law, any judgment against Power Wiring was rendered essentially meaningless.

Marino purchased another entity, Integrated, which operated the same type of business as Power Wiring and serviced Power Wiring's former customers; Marino transferred substantially all of Power Wiring's assets to Integrated. The transfer of the as-

---

[10]The survival of an action does not depend on whether the decedent was the plaintiff or the defendant. We apply the same principles to both cases. See, e.g., *Gasior* v. *Massachusetts Gen. Hosp.*, 446 Mass. 645, 649-651 (2006) (applying rules of survival where plaintiff died); *McStowe* v. *Bornstein*, 377 Mass. 804, 806-809 (1979) (applying rules of survival where defendant died). The survival of a claim for punitive damages, however, does depend on whether the decedent was the plaintiff or the defendant. See note 21, *infra*.

sets of Power Wiring to Integrated was for no or nominal consideration. Substantially all of Power Wiring's employees were retained by Marino as employees of Integrated, and at Marino's instruction, Power Wiring's inventory, trucks, and tools were transferred to Integrated. Marino also instructed a client of Power Wiring to pay to Integrated monies it owed to Power Wiring.

In May, 2006, after Power Wiring failed to pay for the equipment it had purchased from Kraft, Kraft filed an action in the Superior Court, alleging breach of contract. Marino appeared at a preliminary hearing in connection with this action and represented that he personally would make arrangements to ensure payment of the debt. Marino died in June, 2007. In January, 2008, a default judgment entered against Power Wiring in the amount of $259,417.47.

Based on the specific allegations set forth in Kraft's complaint, and the arguments Kraft has made before us, we discern four claims that rely on the doctrine of corporate disregard, by which Kraft seeks to hold Marino and, hence, Marino's estate liable for Power Wiring's actions. Those claims allege breach of contract, fraudulent transfers under the UFTA, violations of G. L. c. 93A, and fraud. Another claim alleges that the transfer of Power Wiring's assets "was an unjust enrichment to the estate of John J. Marino" and thus asserts a claim directly against the estate that it is unjustly retaining funds belonging to Kraft.

The corporate veil "may be pierced where" the corporate principal exercises (1) "some form of pervasive control" over the activities of the corporation, and (2) "there is some fraudulent or injurious consequence" as a result. *Scott* v. *NG US 1, Inc.*, 450 Mass. 760, 767 (2008), quoting *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968).[11] If Kraft can successfully pierce the corporate veil, then Kraft can pursue

---

[11]"Ultimately, the decision to disregard settled expectations accompanying corporate form requires a determination that the [shareholder] directed and controlled the [corporation], and used it for an improper purpose, based on evaluative consideration of twelve factors:

"(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance

these four underlying claims against the estate. In this appeal, we decide only whether each claim survives Marino's death, assuming for this purpose that Kraft can pierce the corporate veil. We do not decide whether Kraft's complaint has adequately stated claims upon which relief can be granted, because that issue is not before us.

i. *Breach of contract.* Although Kraft titles its first claim "Piercing the Corporate Veil," the facts alleged state a cause of action that is, in substance, for breach of contract. Kraft alleges that Power Wiring committed a breach of its contract with Kraft by failing to pay for Kraft's generators. Because contract actions survive the death of a party at common law, *Gasior* v. *Massachusetts Gen. Hosp., supra* at 649, this claim should not have been dismissed.

ii. *Uniform Fraudulent Transfer Act.* Kraft's second claim seeks relief under the UFTA, which is, as described in the statute, a "cause of action with respect to a fraudulent transfer or obligation." G. L. c. 109A, § 10. The UFTA states that a "transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor." G. L. c. 109A, § 5 (*a*) (1). A "creditor" is "a person who has a claim," a "debtor" is "a person who is liable on a claim," and a "claim" is "a right to payment." G. L. c. 109A, § 2. In the case of a fraudulent transfer, the UFTA provides for several possible remedies, including, inter alia, avoidance of the transfer, an attachment, an injunction, and "any other relief the circumstances may require." G. L. c. 109A, § 8.

As the language of the UFTA makes clear, an action for relief under G. L. c. 109A, § 8, depends on the existence of an independently valid claim. In other words, the remedies available under the UFTA "furnish a convenient and expeditious

of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud."

*Scott* v. *NG US 1, Inc.,* 450 Mass. 760, 768 (2008), quoting *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. 546, 555 n.19 (2000).

method by which creditors may satisfy their claims but they do not create claims." *Blumenthal* v. *Blumenthal*, 303 Mass. 275, 279 (1939). Consequently, "[i]f the claim is not established, then the whole proceedings fail and the bill must be dismissed." *Id.* at 278. See *Jorden* v. *Ball*, 357 Mass. 468, 470 (1970). By way of example, we held in *Blumenthal* v. *Blumenthal, supra* at 280, that the plaintiff could not use the fraudulent conveyance law (the UFTA's predecessor) to set aside an allegedly fraudulent conveyance made by her husband, since she had no independently viable claim against him.

Because an action brought under the UFTA provides only a remedy for an independently valid claim, in order to assess whether the action to remedy a fraudulent transfer survives, we must analyze the initial conduct or transaction that gave the creditor a right to payment from the debtor. Where relief from a fraudulent transfer is premised on a contractual right to payment, the claim survives because contract actions survive at common law. See *Gasior* v. *Massachusetts Gen. Hosp., supra* at 649-651 (implied contractual terms in employment at will relationship). See also *Rendek* v. *Sheriff of Bristol County, supra* at 1017; *McStowe* v. *Bornstein, supra* at 806-807. Our decision in *Splaine* v. *Morrissey*, 282 Mass. 217 (1933), upon which both sides rely, is not inconsistent with these principles. That case involved an allegedly fraudulent conveyance made by someone who died after making the conveyance. *Id.* at 219-220. We held that the conveyance was not fraudulent, without discussing whether the suit survived. *Id.* at 220-223. Because the plaintiff had a clear contractual right to payment from the decedent, survival was not an issue. See *id.* at 220. Compare *Portland Gas Light Co.* v. *Ruud*, 242 Mass. 272, 274-275 (1922) (describing conveyance of defendant's home to his daughter to avoid paying damages in anticipated tort suit).

Here, the relief Kraft seeks is premised on a contractual right to payment from Power Wiring. Kraft asserts that Marino caused Power Wiring to commit a breach of its contract with Kraft by failing to pay Kraft for the generators, and that Marino caused Power Wiring to transfer its assets to Integrated "with the actual intent . . . to hinder, delay and defraud" Kraft. Based on these specific allegations, Marino, as the alleged alter ego of Power

Wiring, is the "debtor," a "person who is liable on a claim," G. L. c. 109A, § 2, and Integrated is the "transferee." The underlying claim for which Marino is alleged to be the debtor is Power Wiring's contractual liability to Kraft.[12] Because the underlying claim for which Kraft seeks relief under the UFTA is contractual, not tortious, the UFTA claim survives Marino's death, and the claim should not have been dismissed.

iii. *Chapter 93A.* Kraft's third cause of action alleges violations of G. L. c. 93A. Kraft seeks relief under G. L. c. 93, § 11, which governs commercial transactions between two parties "acting in a 'business context.' " *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 563 (2008). *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22-23, cert. denied, 522 U.S. 1015 (1997).[13] Although the Legislature "originally enacted [G. L.] c. 93A to improve the commercial relationship between consumers and businessmen . . . [,] the addition of § 11 by St. 1972, c. 614, § 2, [extended] these protections . . . to persons engaged in trade or commerce in business transactions with other persons also engaged in trade or commerce" (citation omitted). *Manning* v. *Zuckerman*, 388 Mass. 8, 12 (1983). "The development of the statute, therefore, suggests that the unfair or deceptive acts or practices prohibited are those that may arise in dealings between discrete, independent business entities . . . ." *Id.*

We have not previously had occasion to decide whether a claim pursuant to G. L. c. 93A, § 11, survives the death of a

[12]Based on the way Kraft has pleaded its cause of action under the Uniform Fraudulent Transfer Act, G. L. c. 109A (UFTA), and the way Kraft has argued the issue before us, whether Kraft can bring this action against Marino depends on whether Kraft can pierce the corporate veil, such that Marino is liable for Power Wiring's breach of contract. We do not suggest that a cause of action under the UFTA necessarily requires the plaintiff to pierce the corporate veil in order to hold corporate actors liable for fraudulent transfers.

[13]To determine whether a commercial transaction occurred in a "business context," "we apply the test articulated in *Begelfer* v. *Najarian*, 381 Mass. 177, 190 191 (1980)." *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 564 (2008). "Application of the *Begelfer* 'business context' test requires an assessment of 'the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties . . . . Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons . . . , and whether the participant played an active part in the transaction.' " *Id.*, quoting *Begelfer* v. *Najarian, supra* at 191.

party.[14] The question poses unique challenges, in that G. L.
c. 93A "created new substantive rights by making conduct unlaw-
ful which was not unlawful under the common law or any prior
statute." *Commonwealth* v. *DeCotis*, 366 Mass. 234, 244 n.8
(1974). As we noted in that case, G. L. c. 93A defines unfair
acts or practices by reference to interpretations of those terms in
the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (2006),
in which G. L. c. 93A has its roots. *Id.* at 241-242. The Federal
Trade Commission Act, like G. L. c. 93A, was enacted to expand
consumer protection beyond the "narrow approach of what the
common law regarded as unfair competition, and in effect to
permit, by the gradual process of judicial inclusion and exclu-
sion, a new definition of what is unfair." *Id.* at 242.

We have thus classified some G. L. c. 93A claims as contract-
based, see *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass.
451, 474 (1991),[15] others as tort-based, see *Datacomm Interface,
Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 778 (1986),[16] and
still others as "neither wholly tortious nor wholly contractual in
nature." *Kattar* v. *Demoulas*, 433 Mass. 1, 12 (2000), quoting
*Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975). As
such, a claim under G. L. c. 93A may not lend itself readily to
categorization as contractual or tortious for purposes of determin-
ing whether it survives the death of a defendant.

We have, however, previously considered whether a statutory
cause of action that did not exist at common law survives or
abates on the death of a party. In *Gasior* v. *Massachusetts Gen.
Hosp.*, *supra* at 650-651, we considered whether an employ-
ment discrimination claim brought under G. L. c. 151B survived
the death of the plaintiff. We determined that the claim survived,
because the employment relationship could be viewed as a

[14]The question was raised in *Curtis* v. *Herb Chambers I-95, Inc.*, 458 Mass.
674, 683 n.11 (2011), and *Lattuca* v. *Robsham*, 442 Mass. 205, 217 (2004),
but we resolved each case without reaching the issue.

[15]*Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474 (1991),
quoting *Wang Labs., Inc.* v. *Business Incentives, Inc.*, 398 Mass. 854, 857
(1986), held that "conduct 'in disregard of known contractual arrangements'
and intended to secure benefits for the . . . party [committing the breach]
constitutes an unfair act or practice for [G. L.] c. 93A purposes."

[16]*Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 778
(1986), held that tort actions "for fraud and deceit are within the contempla-
tion of an 'unfair act' under [G. L. c. 93A]."

contract, and the invidious discrimination prohibited by G. L. c. 151B was an implied term of that contractual relationship. Similarly, we conclude that a cause of action brought under G. L. c. 93A will survive if it is, in essence, contractual. We leave for another day whether claims brought under G. L. c. 93A that are not contractual nonetheless survive a party's death.

In order to assess whether Kraft's G. L. c. 93A claim should be classified as contractual, such that it survives Marino's death, we look to the specific allegations of the complaint. Kraft alleges that Marino caused Power Wiring to transfer assets to himself and Integrated, so that Power Wiring would be unable to fulfil its contractual obligations to Kraft. The gravamen of Kraft's G. L. c. 93A claim, therefore, is that Marino undermined Kraft's right to payment under the contract by intentionally "render[ing] Power Wiring insolvent and unable to pay its obligations" to Kraft. Based on these allegations, we conclude that Kraft's G. L. c. 93A claim is contractual in nature and therefore survives Marino's death; dismissal of this claim was error.

In its claim under G. L. c. 93A, however, Kraft seeks not only compensatory damages but also multiple damages of two to three times compensatory damages. Chapter 93A authorizes multiple damages of two to three times a plaintiff's "actual damages" only if a defendant's conduct was "willful or knowing." G. L. c. 93A, §§ 9, 11. The imposition of multiple damages is "designed to impose a penalty . . . that varies with the culpability of the defendant." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 856 (1983). "Like other statutes containing multiple damage provisions, [G. L. c. 93A, §§ 9 and 11,] reflect 'the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindictive lawsuits.' " *Id.* at 857, quoting *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982). See *Haddad* v. *Gonzalez*, 410 Mass. 855, 869 (1991) ("It is established that deterrence is an important goal of the multiple damages provisions of c. 93A").

Because the assessment of multiple damages is premised on a defendant's wrongful conduct, and not the amount of harm suffered by a plaintiff, the multiple damages authorized by G. L. c. 93A "are essentially punitive in nature." *Darviris* v. *Petros*,

442 Mass. 274, 283-284 (2004), quoting *McEvoy Travel Bur., Inc.* v. *Norton Co.*, 408 Mass. 704, 717 (1990). Like punitive damages in tort law, multiple damages under G. L. c. 93A serve the twin "goals of punishment and deterrence." *International Fid. Ins. Co.* v. *Wilson, supra* at 858. Compare Restatement (Second) of Torts § 908(1) (1979) ("Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future"). Such goals can no longer be achieved when the defendant in a given case has died. Upon an individual's death, the law can no longer punish him or deter him from future misconduct; at most, the law can make an example of a deceased defendant by punishing his estate. See Reynolds, Punitive Damages After Death — Can Tort Law Create Heaven and Hell?, 26 Okla. L. Rev. 63, 71 (1973) ("Presumably he is now beyond earthly punishment; and to assess such damages against his estate is to visit the sins of the father on the sons").

The Legislature has addressed the survival of punitive damages in tort actions in the Commonwealth. General Laws c. 230, § 2, provides: "If an action of tort is commenced or prosecuted against the executor or administrator of the person originally liable, the plaintiff shall recover only the value of the goods taken, or the damage actually sustained, without vindictive or exemplary damages, or damages for any alleged outrage to the feelings of the injured party." We construe G. L. c. 230, § 2, as indicative of a legislative policy determination that the goals of punitive damages are no longer served when the wrongdoer has died. This view is expressed in the majority of jurisdictions that have decided this issue,[17] and is reflected in statutes similar to

[17]See *Doe* v. *Colligan*, 753 P.2d 144, 145-146 (Alaska 1988); *Jonathan Woodner Co.* v. *Breeden*, 665 A.2d 929, 938-940 (D.C. 1995), cert. denied, 519 U.S. 1148 (1997); *Lohr* v. *Byrd*, 522 So. 2d 845, 846-847 (Fla. 1988); *Crabtree* v. *Estate of Crabtree*, 837 N.E.2d 135, 138-140 (Ind. 2005); *In re Vajgrt*, 801 N.W.2d 570, 573-578 (Iowa 2011); *Stewart* v. *Estate of Cooper*, 102 S.W.3d 913, 915-916 (Ky. 2003); *Johnson* v. *Levy*, 122 La. 118, 125 (1908); *Thompson* v. *Estate of Petroff*, 319 N.W.2d 400, 408 (Minn. 1982); *Jaramillo* v. *Providence Washington Ins. Co.*, 117 N.M. 337, 344-346 (1994); *Harrell* v. *Bowen*, 179 N.C. App. 857, 859-860 (2006), aff'd, 362 N.C. 142 (2008); *Morriss* v. *Barton*, 200 Okla. 4, 12 (1947); *Olson-Roti* v. *Kilcoin*, 653

our own in other jurisdictions.[18] See generally Restatement (Second) of Torts § 926(b) (1979) ("the death of the tortfeasor terminates liability for punitive damages").[19]

For these reasons, we conclude that multiple damages may not be sought under G. L. c. 93A when the defendant has died.[20] The focus of multiple damages is the defendant's culpability, since multiple damages are triggered only when the defendant's conduct was "willful or knowing." G. L. c. 93A, §§ 9, 11. See *International Fid. Ins. Co.* v. *Wilson*, *supra* at 858. Like punitive damages in tort actions, multiple damages under G. L. c. 93A can no longer achieve the goals of punishing a defendant or deterring him from future misconduct when the wrongdoer has died, and, therefore, they can no longer be imposed.[21]

N.W.2d 254, 260-262 (S.D. 2002); *Hayes* v. *Gill*, 216 Tenn. 39, 48-49 (1965); *In re Estate of Garza*, 725 P.2d 1328, 1330 (Utah 1986); *Parker* v. *Artery*, 889 P.2d 520, 525 (Wyo. 1995).

[18]See Cal. Civ. Proc. Code § 377.42 (West 2004); Colo. Rev. Stat. § 13-20-101(1) (2012); Ga. Code Ann. § 9-2-41 (2007); Idaho Code Ann. § 5-327(1) (2010); Me. Rev. Stat. tit. 18-A, § 3-818 (2012); Miss. Code Ann. § 91-7-235 (2004); Nev. Rev. Stat. § 41.100(2) (2011); N.Y. Est. Powers & Trusts Law § 11-3.2(a)(1) (McKinney 2008); Or. Rev. Stat. § 30.080 (2011); R.I. Gen. Laws § 9-1-8 (1997); Vt. Stat. Ann. tit. 14, § 1454 (2010); Va. Code Ann. § 8.01-25 (2007); Wis. Stat. § 895.02 (2006).

[19]The majority view has not gone unchallenged, however; a minority of jurisdictions allows punitive damages to survive the death of a tortfeasor. While the majority view emphasizes the pointlessness of punishing a dead person, the minority view emphasizes the general deterrence value punitive damages may still carry. See generally Comment, Punitive Damages and the Deceased Tortfeasor: Should Pennsylvania Courts Allow Punitive Damages to be Recovered from a Decedent's Estate?, 98 Dick. L. Rev. 329, 330-338 (1994).

[20]Reasonable attorney's fees and costs are distinct from multiple damages. Unlike multiple damages, which may be awarded only upon a finding that the defendant's act was a wilful or knowing violation of G. L. c. 93A, § 2, reasonable attorney's fees and costs "*shall* . . . be awarded" upon a finding "that there has been a violation of section two" (emphasis added). G. L. c. 93A, § 11. Because reasonable attorney's fees and costs must be awarded upon a finding that the defendant violated G. L. c. 93A, § 2, reasonable attorney's fees and costs are recoverable even if the defendant has died.

[21]That the decedent is the defendant distinguishes this case from *Gasior* v. *Massachusetts Gen. Hosp.*, 446 Mass. 645, 654-655 (2006), in which we held that a claim for punitive damages brought under G. L. c. 151B survives the death of the plaintiff. There, we emphasized that the imposition of punitive damages, even after the plaintiff's death, served "as a deterrent to those employers who engage in invidious discrimination . . . . We see no reason to

*iv. Fraud.* Kraft alleges that Marino misrepresented to Kraft that Power Wiring was not insolvent, knowing that Power Wiring was actually insolvent, for the purpose of inducing Kraft to contract with Power Wiring.

Under the common law, a claim of fraud abates upon the death of either party. See *Metropolitan Life Ins. Co.* v. *De Nicola,* 317 Mass. 416, 419 (1944) ("a suit in equity brought merely to recover damages for fraud abates upon the death of either party, just as an action at law for deceit does"). Moreover, the survival statute does not include fraud among the torts that survive death, unless the fraud results in "damage to real or personal property." G. L. c. 228, § 1 (2) (*d*). See *Read* v. *Hatch,* 19 Pick. 47, 47-48 (1837) (claim of fraudulently inducing sale of goods did not survive defendant's death under survival statute, because "[a] mere fraud or cheat, by which one sustains a pecuniary loss, cannot be regarded as a damage done to personal estate"). See also *Piper* v. *Childs,* 290 Mass. 560, 565-566 (1935); *Givens* v. *Powell,* 239 Mass. 110, 113 (1921); *Rockwell* v. *Furness,* 215 Mass. 557, 558 (1913); *Jenks* v. *Hoag,* 179 Mass. 583, 586 (1901); *Houghton* v. *Butler,* 166 Mass. 547, 548 (1896); *Leggate* v. *Moulton,* 115 Mass. 552, 553 (1874).

Kraft's reliance on *Metropolitan Life Ins. Co.* v. *De Nicola, supra* at 419-420, is misplaced. In that case, we held that a suit to annul a contract for fraud or mistake survives, even though a claim for fraud does not survive. *Id.* Kraft interprets the case to mean that a claim of fraud will survive whenever the underlying dispute arises out of a contract. This reading is overbroad. Indeed, the very purpose of Kraft's lawsuit here is to enforce its contract with Power Wiring, rather than to void the contract.

Kraft is correct that tort claims arising out of an existing contractual relationship may survive death. See, e.g., *McStowe* v. *Bornstein,* 377 Mass. 804, 807 (1979). That case, however, involved alleged legal malpractice that occurred during an existing contractual relationship between the plaintiff and his attorney. See *id.* at 808 ("the existence of a contractual relationship

distinguish as to statutory remedies between a plaintiff who has suffered the indignities of unlawful discrimination (if proved) and who survives, and a similarly aggrieved plaintiff who is deceased, simply because [of] the exigencies of court scheduling." *Id.*

between the plaintiff and the deceased attorney permits the plaintiff's claim against the attorney to survive the attorney's death"). Here, Kraft does not assert a preexisting contractual relationship with Marino at the time that Marino committed the alleged fraud. Rather, the alleged fraudulent conduct was that Marino induced the contractual relationship. A claim of fraudulently inducing a party to enter into a contract does not survive under either the survival statute or at common law. See *Read* v. *Hatch, supra* at 47-48.[22]

*Conclusion.* So much of the judgment dismissing Kraft's claims for breach of contract, relief under the UFTA, violations of G. L. c. 93A, and unjust enrichment, is reversed. The dismissal of Kraft's remaining claims is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

LENK, J. (concurring in part and dissenting in part, with whom Spina and Botsford, JJ., join). I agree with the court on all but one issue. I disagree with the court's view that Kraft Power Corporation (Kraft) may not pursue multiple damages against John J. Marino's estate for Marino's asserted violations of G. L. c. 93A, § 11.[1] I would permit Kraft all appropriate statutorily available remedies.

---

[22]We do not apply the rules of survival to Kraft's claim for unjust enrichment, because Kraft's claim against the estate is premised on the estate's current retention of funds belonging to Kraft. This claim alleges that Marino's transfer of assets from Power Wiring to himself and Integrated "was an unjust enrichment to *the estate of John J. Marino*." The gravamen of Kraft's unjust enrichment claim is that Marino's estate is unjustly retaining funds that belong to Kraft. See Restatement (First) of Restitution § 128 & illustration 3 (1937). Because Kraft's claim for unjust enrichment is against the estate itself for its asserted unjust retention of Kraft's funds, and not against the estate as a substitute for Marino, like Kraft's other claims, this claim presents no issue of survival.

[1]Kraft clarifies in its brief that the claims asserted in its complaint against the estate under the Uniform Fraudulent Transfer Act, G. L. c. 93A, § 11, and for fraud, all depend on its ability to pierce the corporate veil of Power Wiring & Emergency Response Inc. Because Kraft does not bring such claims directly against Marino's estate, I understand the court to be expressing no view as to whether, in the absence of corporate disregard, such direct claims would be capable of surviving death.

The court reasons that Kraft's claim under G. L. c. 93A, § 11, survives against Marino's estate because the claim is, in essence, contractual. In concluding that Kraft may not avail itself of the multiple damages remedy, however, the court relies instead only on authorities dealing with the death of tortfeasors. See, e.g., Restatement (Second) of Torts § 926(b) (1979) ("the death of the tortfeasor terminates liability for punitive damages"). It does so, suggesting that the multiple damages remedy set forth in G. L. c. 93A, § 11, serves the same goals as punitive damages in tort law. *Ante* at 159.[2] The court's reasoning and the result it reaches on this point are puzzling at best.

General Laws c. 93A, § 11, entitles a plaintiff to recover both actual and multiple damages as a matter of statutory right on account of an injury caused by the defendant's knowing or wilful violation of G. L. c. 93A, § 2. To the extent that Kraft's right to pursue actual damages under G. L. c. 93A, § 11, survives only because its substantive claim is contractual rather than tortious in nature, it follows logically that Kraft's right to seek multiple damages should also survive. Both forms of damages recovery derive wholly from the same statutory source.

Moreover, I am not persuaded that the comparison of tortfeasors with those who purposefully violate G. L. c. 93A, § 11, is especially useful when considering whether multiple damages under the latter should survive. There is ample reason to conclude that multiple damages should be available against the estates of those who, by their wilful or knowing misconduct in a business context, violate G. L. c. 93A, § 11, a statute with broad remedial purposes.

We have previously considered whether punitive damages provided for by a statute with broad remedial purposes survive the death of a litigant.[3] In *Gasior* v. *Massachusetts Gen. Hosp.*,

---

[2]The court also cites G. L. c. 230, § 2, which states, "If an action of tort is commenced or prosecuted against the executor or administrator of the person originally liable, the plaintiff shall recover only the value of the goods taken, or the damage actually sustained, without vindictive or exemplary damages . . . ." Rather than supporting its conclusion that multiple damages under G. L. c. 93A, § 11, are not intended to survive death, it suggests the contrary, since the Legislature explicitly limited its prohibition against punitive damages after death to "action[s] of tort." It does not employ, as it could have, a more encompassing alternative such as, "If any action is commenced . . . ."

[3]General Laws c. 151B prohibits discrimination in employment. In the

446 Mass. 645 (2006) (*Gasior*), we determined that the punitive damages available under G. L. c. 151B, § 9, survived the death of the plaintiff, whose substantive claim was contractual in nature. In so doing, we reasoned that the damages were "part of a scheme to vindicate a 'broader public interest in eradicating systemic discrimination [at work].' " *Id.* at 654, quoting *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 563, cert. denied sub nom. *Wilfert Bros. Realty Co.* v. *Massachusetts Comm'n Against Discrimination*, 543 U.S. 979 (2004). Allowing the punitive damages remedy to survive death was thus "consistent with the broad remedial purposes" of the statute. *Id.* at 655. For similar reasons, I believe that the multiple damages remedy available under G. L. c. 93A, § 11, should survive death.[4]

Like the punitive damages that were found to survive death in *Gasior*, the multiple damages available under G. L. c. 93A, § 11, are part of a legislative scheme to vindicate broader public interests. In G. L. c. 151B, it is to "eradicat[e] systemic discrimination" in the context of employment. *Gasior, supra* at 654. In G. L. c. 93A, it is to eradicate unfair methods of competition or deceptive acts or practices in trade and commerce. See *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 857 (1983), quoting *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982) (multiple damages provisions of G. L. c. 93A, § 11, "reflect 'the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindicative lawsuits' ").

The court takes the view, however, that since multiple damages are unable to deter a particular deceased wrongdoer from further misconduct, multiple damages awarded against his estate

event of violation, G. L. c. 151B, § 9, generally provides, inter alia, for punitive damages but, in the context of age discrimination in employment, provides for multiple damages upon a finding "that the act or practice complained of was committed with knowledge, or reason to know, that [it] violated the provisions of . . . section four."

[4]The court distinguishes *Gasior* v. *Massachusetts Gen. Hosp.*, 446 Mass. 645 (2006), on the grounds that the decedent in that case was the plaintiff, and that allowing punitive damages to survive his death furthered the deterrent purposes of the statute by punishing the specific defendant who acted wrongfully. *Ante* at note 21. This distinction rests upon a narrow view of deterrence which I reject.

serve no deterrent function at all and thus should not survive. *Ante* at 158. This is an unduly restrictive view of deterrence. We have previously explained that multiple damages are meant to deter both "actual and potential wrongdoers." *Drywall Sys., Inc.* v. *ZVI Constr. Co.*, 435 Mass. 664, 670 (2002). While allowing multiple damages to survive against Marino's estate would of course have no deterrent effect upon Marino, it might well deter potential wrongdoers from similarly engaging in knowing or wilful conduct that violates G. L. c. 93A, §§ 2 and 11. The realization that heirs stand to lose more than they might otherwise gain from the fruits of the wrongdoer's purposeful misconduct may well serve to deter the potential wrongdoer from engaging in unfair methods of competition and unfair or deceptive business practices.

Allowing the multiple damages remedy available under G. L. c. 93A, § 11, to survive death is also consistent with the statute's alternative purpose of "encourag[ing] vindicative lawsuits." See *McGrath* v. *Mishara, supra* at 85. "Multiple damages are 'the appropriate punishment' for forcing plaintiffs to litigate clearly valid claims." *International Fid. Ins. Co.* v. *Wilson, supra* at 857, quoting *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 628 (1978). Mindful that we have permitted punitive damages under G. L. c. 151B to survive death because doing so is "[c]onsistent with the broad remedial purposes" of the statute, *Gasior, supra* at 654, G. L. c. 93A, too, has been described as a statute of "broad impact" with "far-reaching effects." *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 693 (1975).

Nor should it be ignored that a "prime goal" of the multiple damages provision of G. L. c. 93A, § 11, is "[t]he promotion of reasonable settlement offers." *International Fid. Ins. Co.* v. *Wilson, supra* at 857. See G. L. c. 93A, § 11 (if wrongdoer tenders "offer of settlement for single damages" that is rejected, and court finds that tendered offer "was reasonable in relation to the injury suffered, then the court shall not award more than single damages"). The multiple damages provision of G. L. c. 93A, § 11, was "designed" by the Legislature "to make it 'unprofitable' for a defendant to ignore meritorious claims." *International Fid. Ins. Co.* v. *Wilson, supra* at 857, quoting *Heller* v. *Silverbranch Constr. Corp., supra* at 627. By limiting

a plaintiff's remedy to single damages following the death of one who is alleged to have been in knowing or wilful violation of G. L. c. 93A, §§ 2 and 11, the court "dilut[es]" the estate's incentive to settle and thereby thwarts a "prime goal" of the Legislature in providing for multiple damages. *International Fid. Ins. Co.* v. *Wilson, supra* at 858.

Lastly, any suggestion that allowing multiple damages to be imposed on an estate somehow unfairly penalizes innocent heirs is something of a red herring. Had Marino died the day after an adverse judgment under G. L. c. 93A, § 11, entered against him, inclusive of an award of multiple damages, his estate would have been responsible for paying it. His heirs' noninvolvement in the wrongdoing would not have saved them from paying the price for it. See G. L. c. 190B, §§ 3-801 to 3-816. Multiple damages under G. L. c. 93A, § 11, are only available for "willful or knowing violation[s]" of G. L. c. 93A, §§ 2 and 11, and should not be precluded because of the untimely death of the wrongdoer.