# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD F. BURKHART, WILLIAM E. KELLY, RICHARD S. LAVERY, THOMAS R. PRATT, GERALD GREEN, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0691-JRS |
| GENWORTH FINANCIAL, INC., GENWORTH HOLDINGS, INC., GENWORTH NORTH AMERICA CORPORATION, GENWORTH FINANCIAL INTERNATIONAL HOLDINGS, LLC AND GENWORTH LIFE INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

Date Submitted: November 12, 2019
Date Decided: January 31, 2020

Peter B. Andrews, Esquire, Craig J. Springer, Esquire and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware and Edward F. Haber, Esquire, Thomas V. Urmy, Jr., Esquire, Patrick J. Vallely, Esquire and Michelle H. Blauner, Esquire of Shapiro Haber & Urmy LLP, Boston, Massachusetts, Attorneys for Plaintiffs.

Daniel A. Dreisbach, Esquire, Srinivas M. Raju, Esquire, Susan M. Hannigan, Esquire, Sarah A. Clark, Esquire and Angela Lam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Reid L. Ashinoff, Esquire and Gary Meyerhoff, Esquire of Dentons US LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Plaintiffs are a class of insureds who hold long-term care insurance policies and insurance agents who allege they are entitled to commission payments for selling such policies. Defendant, Genworth Life Insurance Company ("GLIC"), underwrote the long-term care insurance policies at issue. Plaintiffs allege that, as early as 2012, GLIC's management knew that GLIC was sinking. The skyrocketing cost of healthcare caused GLIC to pay out more in claims than it could collect from premiums. And insurance regulators were not allowing GLIC to increase premiums to offset its growing costs. According to Plaintiffs, on the brink of its demise, GLIC's owners engaged in an intentional plan to syphon off GLIC's assets before it was too late.

From 2012 to 2014, it is alleged that those in control of GLIC caused GLIC to declare $410 million in dividends. They also terminated intra-company contracts that provided GLIC with various financial supports. Public reports filed in 2015 and 2017 announced the plan to isolate GLIC from its affiliates because of adverse events in the long-term care insurance industry.

More than a year later, in 2018, Plaintiffs filed a complaint in this Court under the Delaware Uniform Fraudulent Transfer Act (the "DUFTA").[1] In their Verified Amended Class Action Complaint (the "Complaint"), Plaintiffs allege GLIC

---

[1] 6 *Del. C.* §§ 1301–11.

1

engaged in both actual and constructive fraudulent transfers.[2] They ask the Court to restore to GLIC the value of the assets that were syphoned away from 2012–2014.

In response, Defendants have filed a Motion to Dismiss. They argue the Complaint cannot proceed for two reasons. *First*, by Defendants' lights, Plaintiffs lack standing to bring the Complaint. They say Plaintiffs have not suffered an actual, concrete injury in fact because GLIC has not defaulted on any obligations it owes to any member of the putative class. Thus, even if Plaintiffs fear that GLIC may *someday* fail to pay their insurance claims or sales commissions, that fear of injury is too speculative to confer standing to prosecute a cognizable claim for fraudulent transfer.

*Second*, Defendants argue Plaintiffs' attempts to reverse some of GLIC's dividends are time barred under the DUFTA's statute of limitations. They say that Plaintiffs were on inquiry notice of GLIC's alleged plan no later than February 2017, after GLIC's owners publicly announced the plan to "isolate" GLIC.

After carefully considering the parties' arguments, I conclude that Plaintiffs *do* have standing. In this regard, I am satisfied our General Assembly intended to provide a right of action to those who are threatened by fraudulent transfers before the transfers have had the full effect of dissipating protected assets. On the other

---

[2] Am. Verified Class Action Compl. (the "Compl.") (D.I. 19).

hand, I conclude the Complaint is time barred to the extent it challenges dividends GLIC declared and paid prior to 2014.  My reasons follow.

## I.   FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to that pleading and judicially noticeable facts.[3] For purposes of this Motion to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[4]

### A. The Parties

As the relationships between and among the named Defendants is complex, it is useful to begin the identification of parties with reference to an organizational chart: [5]

---

[3] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)) (noting that on a motion to dismiss, the court may consider documents that are "incorporated by reference" or "integral" to the complaint); D.R.E. 201–02 (codifying Delaware's judicial notice doctrine).

[4] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[5] Chart compiled from Compl. ¶¶ 1, 2, 7–11.



Defendant, Genworth, sits atop a corporate conglomerate and wholly-owns its subsidiaries, Defendants GFIH, Genworth NA and GLIC.[6] GLIC is an insurance company that provides, among other products, long-term care insurance policies.[7]

Two distinct groups of individuals comprise the class of Plaintiffs: (i) holders of long-term care insurance policies issued by GLIC, and (ii) insurance agents

---

[6] Compl. ¶¶ 7–11.

[7] Compl. ¶ 11.

entitled to payment streams from GLIC based on commissions they earned from selling GLIC policies.[8]

## B. Genworth's Business

Through its subsidiaries, Genworth sells a variety of insurance products. GFIH is engaged in the mortgage insurance business, an industry that has been profitable in recent years.[9] GLIC sells long-term care insurance policies. Unlike GFIH, GLIC has encountered economic headwinds.[10] Heavy regulation and high healthcare costs have squeezed long-term care insurance providers from both sides.[11]

The purpose of a long-term care insurance policy is to offset the costs of care that policyholders may incur when and if they become eligible for benefits under their policies.[12] The policies provide benefits when the insured becomes unable to perform certain activities (such as bathing, dressing and walking).[13] The expectation is that when a policyholder is no longer able to engage in these activities of daily

---

[8] Compl. ¶¶ 2–6, 14.

[9] Compl. ¶ 18.

[10] Compl. ¶¶ 14, 19.

[11] Compl. ¶¶ 48, 58.

[12] Compl. ¶ 15.

[13] Compl. ¶¶ 15, 39.

living, they will enter an assisted living or nursing facility and their long-term care insurance will cover some or all of those costs.[14]

Policyholders must continue to pay their premiums during healthy years, and eventually qualify for long-term care under the terms of their policies, before GLIC will owe them any benefits.[15] Given the uncertainty of coverage, the specific amount (if any) each Plaintiff (as a GLIC policyholder) will receive from GLIC is currently unknown.[16] But, as alleged, Plaintiffs' collective insurance claims will be billions of dollars and are, as an actuarial matter, certain to occur.[17]

## C. Regulation, Statutory Financials and Reserves

States heavily regulate premiums charged for long-term care insurance.[18] Regulators must approve any premium increase GLIC charges to its policyholders even if increases are designed to compensate for the ever-escalating costs of

---

[14] Compl. ¶¶ 15, 39.

[15] Compl. ¶ 27.

[16] *Id.*

[17] *Id.* Plaintiffs' rights to receive benefits are triggered when they "become unable to perform at least two principal activities of daily living." Compl. ¶ 39. It is impossible to know any specific policyholder's future claims, but insurance companies make actuarial forecasts regarding the *average* amount of claims policyholders, as a group, will make in the future. *See* Compl. ¶ 43; *see also* Compl. ¶ 27 ("[A]s an actuarial matter, [Plaintiffs' claims are] certain to occur.").

[18] Compl. ¶¶ 43, 83.

healthcare.[19] This dynamic means that GLIC could suffer cash shortfalls if regulators deny or delay rate increases.[20] Because of this risk, GLIC must file annual and quarterly financial statements ("Statutory Financials") with the Delaware Department of Insurance (the "DOI") to demonstrate its ready ability to pay its policyholders' claims.[21]

The Complaint alleges GLIC's Statutory Financials do not accurately represent its financial status.[22] In short, Plaintiffs allege that the skyrocketing costs of healthcare have driven GLIC's future liabilities much higher than GLIC has projected in its Statutory Financials.[23]

To account for these increased costs, GLIC publicly restated its Statutory Financials by adding $589 million to its liabilities in 2014 (the "2014 Adjustment"),

---

[19] Compl. ¶¶ 43–44.

[20] Compl. ¶ 48.

[21] Compl. ¶¶ 52, 83. GLIC is a Delaware-chartered insurer and is, therefore, regulated by the DOI. Compl. ¶ 52.

[22] Compl. ¶ 51.

[23] Compl. ¶¶ 58–72. Plaintiffs allege GLIC's disabled policyholders were making claims under their policies for 36% longer than projected in GLIC's Statutory Financials. Compl. ¶¶ 58, 65–66. Plaintiffs further allege these projections were incorrect because certain GLIC actuaries had intentionally manipulated assumptions to reduce GLIC's liabilities. Compl. ¶ 63. These misstatements led to the resignation of two GLIC executives in July 2014 and prompted Genworth to engage PriceWaterhouseCoopers to review GLIC's actuarial projections and associated liabilities. Compl. ¶¶ 65–67.

7

followed by another $432 million increase in 2016 (the "2016 Adjustment").[24] In the wake of the 2014 Adjustment, Genworth's stock price dropped 55%, and a federal securities fraud class action followed.[25] According to Plaintiffs, the 2014 and 2016 Adjustments *still* intentionally fail to reflect the full magnitude of GLIC's troubles.[26]

As Plaintiffs see it, while GLIC's Statutory Financials show its assets exceed its liabilities by billions of dollars, it is, in reality, insolvent.[27] To compound these difficulties, Plaintiffs allege regulators have increasingly refused to allow GLIC to increase its premium rates.[28] Thus, it is alleged that, as early as 2012, GLIC was taking on water in two places. Skyrocketing healthcare costs were draining GLIC's resources while regulators' resistance to rate increases squeezed its revenue.[29]

---

[24] Compl. ¶¶ 71, 75.

[25] Compl. ¶¶ 72–73. *See In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759 (E.D. Va. 2015) (denying a motion to dismiss). The class action suit was settled with a $200 million payment from Genworth to stockholders. Compl. ¶ 74.

[26] Compl. ¶¶ 75–76.

[27] Compl. ¶¶ 56, 77–78. The crux of Plaintiffs' allegations about GLIC's insolvency is that the 2014 and 2016 Adjustments only increased GLIC's liabilities to account for its policyholders *who were already making claims*. Compl. ¶ 78. If GLIC had updated its liabilities for policyholders *who will make, but have not yet made, a claim*, this update would result in an increase in GLIC's liabilities by more than $4 billion. Compl. ¶¶ 78–79.

[28] Compl. ¶¶ 84–88.

[29] Compl. ¶ 96.

Even while GLIC allegedly has been floundering, it has continued to pass the DOI's financial tests and has missed no payments owed to the policyholder Plaintiffs or any other policyholder.[30] Indeed, the Complaint does not allege that Plaintiffs have made claims under their policies, much less that any such claim has been denied.

## D. The Agents' Commissions

For their part, the insurance agent Plaintiffs allege that their commission arrangement with GLIC guarantees them "a payment stream" that will "continu[e] long into the future."[31] As with the policyholder Plaintiffs, however, the Complaint does not allege that GLIC has ever defaulted on any obligation to pay an insurance agent commission.

## E. GLIC's Dividends

According to the Complaint, when Genworth noticed GLIC beginning to list, it caused GLIC to declare dividends in an attempt to syphon assets from GLIC before it sank.[32] Specifically, Plaintiffs allege the following dividends transferred assets from GLIC to Genworth NA and up to Holdings, all for inadequate consideration, at

---

[30] Compl. ¶ 83.

[31] Compl. ¶ 5.

[32] Compl. ¶¶ 21–23, 96.

9

a time when GLIC was insolvent and with the express purpose of placing assets beyond Plaintiffs' reach as GLIC's policyholders and insurance agents:

- $190 million in 2012;
- $190 million in 2013;
- $15 million in 2014;
- $15 million in 2015 (collectively, the "Dividends").[33]

## F. The 2016 Reinsurance Termination

Before 2016, Genworth maintained an inter-company reinsurance arrangement through which GFIH and related entities provided capital support to GLIC.[34] On March 2, 2015, however, Genworth's annual report announced a plan to sever these contractual ties in an intentional effort to shield Genworth's shareholders from GLIC's expanding liabilities (the "Reinsurance Termination").[35] Genworth disclosed that "adverse developments in [GLIC's] . . . business (including the recent increases in our [liabilities] of that business)" could adversely impact Genworth's business as a whole.[36]

---

[33] Compl. ¶¶ 23, 98–100.

[34] Compl. ¶ 24.

[35] Compl. ¶¶ 96, 101, 112. Genworth's 2016 10-K similarly expressed a desire to "separate, then isolate" GLIC's business. Compl. ¶ 116.

[36] Compl. ¶ 113.

In keeping with its announcement, in 2016, Genworth launched the Reinsurance Termination.[37] The results, according to Plaintiffs, were that GLIC lost contractual support for its liabilities and received inadequate consideration for the Reinsurance Termination while, at the same time, Genworth was able to isolate its assets from GLIC's liabilities going forward.[38]

## G. Procedural History

Plaintiffs filed the operative Complaint on January 29, 2019.[39] In Counts I and III, Plaintiffs allege Genworth authorized the Dividends and the Reinsurance Termination with the actual intent to hinder, delay or defraud Plaintiffs as GLIC's policyholders and agents.[40] In Counts II and IV, Plaintiffs allege Genworth caused GLIC to declare the Dividends and effectuate the Reinsurance Termination while GLIC was insolvent and without giving GLIC adequate consideration.[41] Accordingly, Plaintiffs seek a permanent injunction that would unwind both the Dividends and the Reinsurance Termination.[42]

---

[37] Compl. ¶¶ 109–10.

[38] Compl. ¶¶ 109–12.

[39] D.I. 9; D.I. 19.

[40] Compl. ¶¶ 141–47, 154–59.

[41] Compl. ¶¶ 148–53, 160–65.

[42] Compl. ¶ 29.

Defendants filed their Motion to Dismiss on November 26, 2018, under Court of Chancery Rule 12(b)(6).[43] The motion raises two grounds for dismissal. *First*, Defendants argue Plaintiffs have failed to plead an "injury in fact" sufficient to confer standing to sue.[44] *Second*, they argue Plaintiffs' claims that the Dividends constituted fraudulent transfers are time barred under the doctrine of laches.[45]

Before oral argument on Defendants' Motion to Dismiss, Plaintiffs asked the Court to enter a status quo order.[46] Following briefing on both the Motion to Dismiss and the Motion for a Status Quo Order, the Court heard oral arguments on both motions on October 21.[47] After supplemental briefing from both parties, both

---

[43] D.I. 9. Defendants cite Rule 12(b)(6) as the sole basis for their Motion to Dismiss. Their challenge to Plaintiffs' standing is jurisdictional, however, and this implicates Rule 12(b)(1). *Dover Hist. Soc. v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003); *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1283–84 (Del. 2007) (holding that challenge to plaintiff's standing must be brought under Rule 12(b)(1), not Rule 12(b)(6)). I look past the technical deficiency and address the motion on its merits—especially given that the Court could have raised the issue *sua sponte*. *See Critchfield v. Engfer*, 2016 WL 2755933, at *1 (Del. Ch. May 9, 2016) ("The issue of subject matter jurisdiction is 'crucial,' and the Court is obligated to ensure it exists, even if it must raise the issue *sua sponte*.").

[44] D.I. 9.

[45] *Id.*

[46] D.I. 37.

[47] D.I. 71.

motions were submitted for decision on November 12, 2019.[48]  I denied Plaintiffs'

Motion for a Status Quo Order in a bench ruling on November 18, 2019.[49]  This is

the Court's decision on Defendants' Motion to Dismiss.

## II. ANALYSIS

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6),

the Court applies a well-settled standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[50]

Under Rule 12(b)(1), "the Court of Chancery will dismiss an action for want of subject

matter jurisdiction if it appears from the record that the Court does not have jurisdiction

over the claim."[51]  "The plaintiff bears the burden of establishing the Court's jurisdiction,

and where the plaintiff's jurisdictional allegations are challenged through the introduction

---

[48] D.I. 77; D.I. 78; D.I. 79; D.I. 80; Compendium of Unreported Authorities Cited in Letter to the Hon. Joseph R. Slights III from Peter B. Andrews Addressing the Court's Questions Following Oral Arg. ("Pls.' Compendium") (D.I. 76).

[49] D.I. 81; D.I. 83.

[50] *Savor*, 812 A.2d at 896–97 (citations omitted).

[51] *Acierno v. New Castle Cty.*, 2006 WL 1668370, at *3 (Del. Ch. June 8, 2006) (internal quotations omitted).

of material extrinsic to the pleadings, he must support those allegations with competent proof."[52]

While Defendants have challenged Plaintiffs' standing and the timeliness of some of Plaintiffs' claims, they have not otherwise challenged the *bona fides* of Plaintiffs' attempt to plead a *prima facie* cause of action under 6 *Del. C.* § 1304.[53] Therefore, I do not examine today whether Plaintiffs have well pled: (i) fraudulent intent under 6 *Del. C.* § 1304(a)(1), or (ii) that GLIC was insolvent during the relevant period (notwithstanding the DOI's approvals) or received reasonably equivalent value for the transfers under 6 *Del. C.* § 1304(a)(2).[54] Instead, I review the Complaint on narrower grounds to determine whether Plaintiffs have carried their burden of establishing they have standing and whether the Complaint, on its face, implicates the affirmative defense of laches.

---

[52] *Id.*

[53] *Cf. Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 195–200 (Del. Ch. 2014) (examining whether, for example, a plaintiff had well pled that the defendant was insolvent).

[54] In this regard, I note that my willingness to draw inferences regarding Genworth's *intentional* attempts fraudulently to transfer assets is informed by (i) the well-established standards under Rule 12(b)(6) and (ii) the specific issues raised in Defendants' Motion to Dismiss, which did not challenge Plaintiffs' *prima facie* case except on standing grounds. That I draw such inferences today does not mean they (i) would be supported by the actual evidence or (ii) would be warranted under an elevated pleading standard, such as those imposed by Court of Chancery Rules 9(b) or 23.1.

## A. Plaintiffs Have Standing Under the DUFTA's Plain Language

GLIC has not defaulted on any obligation it owes to Plaintiffs.[55]  Accordingly, Defendants maintain that Plaintiffs' fraudulent transfer claim is predicated upon the rank speculation that, at some time in the future, GLIC will fail to pay a long-term insurance claim or a commission owed to an agent who sold its policies.  Because Plaintiffs have not suffered an actual, concrete or certainly impending injury, say Defendants, Plaintiffs have no standing to sue.  For reasons explained below, I disagree.

### 1.  The Legal Standard for Standing

When a party seeks to invoke this court's jurisdiction, he bears a burden of demonstrating that he has standing to bring his claims.[56]  At the pleading stage, "general allegations of injury are sufficient to withstand a motion to dismiss because it is 'presume[d] that general allegations embrace those specific facts that are necessary to support the claim.'"[57]

---

[55] Oral Arg. Re Defs.' Mot. to Dismiss and Pls.' Mot. for a Status Quo Order ("Tr.") (D.I. 75) at 41–42.

[56] *See Dover Hist. Soc.*, 838 A.2d at 1109 ("The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing.").

[57] *Ritchie CT Opps, LLC v. Huizenga*, 2019 WL 2319284, at *8 (Del. Ch. May 30, 2019) (citing *Dover Hist. Soc.*, 838 A.2d at 1110; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

"The requirements for establishing standing in the courts of Delaware are generally the same as the standard established by the United States Supreme Court to govern standing in federal courts."[58] These elements can be summarized as follows:

- the plaintiff must have suffered an *injury in fact*—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
- there must be a *causal connection* between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and
- it must be likely, as opposed to merely speculative, that the injury will be *redressed by a favorable decision*.[59]

Defendants' Motion to Dismiss focuses principally on Plaintiffs' burden to establish they have suffered an injury in fact—which is the "quintessence of standing."[60] In particular, Defendants take issue with Plaintiffs' assertion that they have suffered an injury that is "concrete" and either "actual or imminent."[61]

---

[58] *Id.*, at *8 (citation omitted).

[59] *Dover Hist. Soc.*, 838 A.2d at 1110 (emphasis supplied and internal quotations and citations omitted); *see also Ritchie*, 2019 WL 2319284, at *9 (holding that a concrete injury must be "*de facto*; that is, it must actually exist.") (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)).

[60] *Ritchie*, 2019 WL 2319284, at *9; DOB at 24 (questioning whether Plaintiffs have alleged an "actual injury").

[61] *Dover Hist. Soc.*, 838 A.2d at 1110.

16

While a "concrete" injury does mean an "actual injury," it "does not necessarily mean tangible; intangible injuries may also be concrete."[62] In determining whether an intangible harm constitutes an injury in fact in the context of a statutory claim, "the judgment of [the General Assembly] play[s] an important role[] . . . because [it] is well positioned to identify intangible harms that meet minimum [standing] requirements."[63] In other words, the General Assembly has the power to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law."[64]

While the General Assembly can influence the law of standing, Plaintiffs must always allege an actual, concrete injury.[65] A mere "procedural" violation of a "statutory right" will not suffice.[66] For example, in *Spokeo, Inc. v. Robins*, the United States Supreme Court addressed a law that prohibited credit reporters from disseminating false information.[67] In dicta, the Court reasoned that the incorrect dissemination of a person's zip code (as an alleged wrong) might not "present any

---

[62] *Ritchie*, 2019 WL 2319284, at *9 (quoting *Spokeo*, 136 S. Ct. at 1548–49).

[63] *Spokeo*, 136 S. Ct. at 1549.

[64] *Id.* at 1549 (internal citations and quotations omitted).

[65] *Id.*

[66] *Id.*

[67] *Id.* at 1542–43, 1550 (discussing the Fair Credit Reporting Act).

material risk of harm."[68]  Thus, while mistaken dissemination of zip codes would be a statutory violation, the harm that flows from that violation might not confer standing.  Because the court below had held the plaintiff had standing merely because he alleged a statutory violation, the Supreme Court reversed the decision and remanded for further inquiry regarding the existence and scope of any actual injury.[69]

*Spokeo* teaches that courts must distinguish harmless, "technical," statutory violations from violations presenting a "material risk of harm."[70]  When the statutory violation presents a material risk of harm, that risk will confer standing even if the risk would not otherwise confer standing in the absence of the applicable statute.[71]

### 2.  Standing under the DUFTA

Defendants' standing argument rests on the premise that Plaintiffs have failed to plead an injury that is "certainly impending" because any eventual nonpayment of claims or commissions would require multiple intervening events, including, for

---

[68] *Id.* at 1550.

[69] *Id.* (The Supreme Court remanded the case to the 9th Circuit Court of Appeals because that court failed to consider whether the statutory violations alleged in the complaint (incorrect reporting of age, marital status, and education) "work[ed] any concrete harm.").

[70] *Id.* at 1149–50 ("Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.") (citing *Lujan*, 504 U.S. at 578).

[71] *Id.*

example, continued resistance from regulators to GLIC's proposed premium increases.[72] As Defendants see it, even if Plaintiffs have alleged *technical* violations of the DUFTA, that is not enough, *ipso facto* or *ipso jure* to confer standing.[73] With that basic proposition, I agree.

But Plaintiffs have alleged specific violations of the DUFTA that have caused a "material risk of harm" to Plaintiffs.[74] Specifically, they have alleged that, among other things, Defendants transferred substantial assets in an intentional effort to avoid an intact contractual obligation to pay Plaintiffs billions of dollars to cover the most essential of human expenses and to make good on earned sales commissions.[75] That is exactly the "material risk of harm" the General Assembly sought to mitigate

---

[72] DOB at 25–27 (citing, among other cases, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

[73] *Id.*

[74] *Spokeo*, 136 S. Ct. at 1549.

[75] Compl. ¶¶ 27, 39.

19

when enacting the DUFTA.[76] This harm is nothing like the inconsequential harm discussed in *Spokeo*.[77]

DUFTA codifies the harm Plaintiffs have alleged here. The General Assembly chose to define "creditors" broadly as those who hold "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured or

---

[76] UNIFORM FRAUDULENT TRANSFER ACT § 4 cmt. 7 (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 1984) (Pls.' Compendium at tab 4) (the "UFTA") ("The effect of [fraudulent] transfers, . . . if not avoided, may be to permit a debtor . . . to deprive the debtor's unsecured creditors of access to the debtor's assets for the purpose of collecting their claims while the debtor . . . arrange[s] for the beneficial use or disposition of the assets in accordance with [its] interests."). The UFTA was enacted "[b]ecause intent to hinder, delay, or defraud creditors is seldom susceptible of direct proof," so the Commissioners on Uniform State Laws "sought to minimize or eliminate [state law differences] by providing that proof of certain fact combinations would conclusively establish fraud. . . . An important reform effected by the UFTA was the elimination of any requirement that a creditor have obtained a judgment or execution returned unsatisfied before bringing an action to avoid a transfer as fraudulent." UFTA at 1 (prefatory note).

[77] Compl. ¶¶ 97 ("Defendants have been engaged in a program intended to strip . . . financial backing from GLIC and thereby to isolate GLIC so that it could fail without affecting the rest of Genworth's enterprise."), 39 (Plaintiffs' policies play a "profoundly important role" in the financing of their future care); *see Spokeo*, 136 S. Ct. at 1550. Defendants rely heavily on *Ross v. AXA Equitable Life Ins. Co.* 115 F. Supp. 3d 424 (S.D.N.Y. 2015), but that case is distinguishable on its facts. *See* DOB at 27. *Ross* analyzed a transaction with alleged fraudulent undertones and held the plaintiffs there lacked standing. But the key difference is that the plaintiffs in *Ross* did *not* allege that defendants had engaged in a fraudulent transfer. Rather, they alleged violations of Section 4226 of New York's Insurance Law—which proscribed misleading representations about insurance products. *Id.* at 431; *see also Robainas v. Metro. Life Ins. Co.*, 2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) (same). The language in the DUFTA that confers standing here, therefore, was not before the court.

20

unsecured."[78] As holders of insurance policies with rights to submit future claims, and agents with rights to future commission payments, Plaintiffs meet this definition.[79]

The DUFTA protects a "creditor" from two types of fraudulent transfers. *First*, 6 *Del. C.* § 1304(a)(1) prohibits "transfer[s]" by debtors that are made "with actual intent to hinder, delay or defraud" ("actual fraudulent transfers").[80] *Second*, 6 *Del. C.* § 1304(a)(2) prohibits "transfer[s]" by debtors where the debtor (i) did not receive "reasonably equivalent value" *and* (ii) was rendered insolvent ("constructively fraudulent transfers").[81] Plaintiffs have alleged the Dividends and the Reinsurance Termination were both actual and constructive fraudulent transfers.[82]

In Section 1307, the DUFTA unequivocally provides that "in an action for relief . . . a creditor . . . may obtain: [] [a]voidance of the [fraudulent] transfer . . . to

---

[78] 6 *Del. C.* § 1301(3), (4) (definitions of "creditor" and "claim") (emphasis supplied).

[79] Compl. ¶¶ 2–6.

[80] 6 *Del. C.* § 1304(a)(1).

[81] 6 *Del. C.* § 1304(a)(2). Insolvency occurs when the debtor has either (i) "unreasonably small [assets] in relation to its business" or (ii) "debts beyond the debtor's ability to pay as they became due." 6 *Del. C.* § 1304(a)(2)(a), (b).

[82] Compl. ¶¶ 141–65.

21

the extent necessary to satisfy the creditor's claim."[83]  Despite (or perhaps because

of) the DUFTA's clear language, the question presented here—whether a creditor

with an unmatured and contingent claim has standing to bring a claim under the

DUFTA when her contractual right to payment is not yet mature—has not been

addressed by Delaware courts.  I asked the parties for supplemental briefing on this

question.[84]  And after considering their briefs and supplemental materials, I am

persuaded the answer to the question is *yes*—that is, a creditor with an unmature and

contingent claim does have standing to bring a claim under the DUFTA even though

her contractual right to payment is contingent and not yet mature.[85]

Creditors are not "required to stand by helplessly until a distant maturity date

arrives while his debtor is fraudulently depleted of all assets."[86]  In short, the injury

---

[83] 6 *Del. C.* § 1307.

[84] D.I. 73.

[85] I note that at least one other court has addressed the same question and it likewise determined that standing exists under the UFTA to pursue "unmature and contingent claims."  In that case, the court wrote, "[debtors do] . . . not dispute that [p]laintiffs have a right to payment, but they essentially argue that [p]laintiffs cannot take steps under the UFTA to protect [their] right[s to payment] unless [Debtor] has 'missed a payment' or 'breached an obligation'—regardless of whether the corporation currently may be rendering itself insolvent through insider transfers so that it will ultimately be unable to repurchase the notes at full value when they become due.  Reaching this conclusion would require the Court to disregard the plain language of the UFTA that expressly encompasses claims that are unmatured and contingent." *Akanthos Capital Mgmt., LLC v. CompuCredit Hldgs. Corp.*, 770 F. Supp. 2d 1315, 1329–30 (N.D. Ga. 2011), *rev'd on other grounds*, 677 F.3d 1286 (11th Cir. 2012).

[86] *Cruden v. Bank of N.Y.*, 957 F.2d 961, 974 (2d Cir. 1992).

22

Plaintiffs have alleged is the quantum of prejudice creditors suffer when their debtors intentionally move assets to defraud them.[87] To hold that this injury does not confer standing would be to contradict the DUFTA's plain language. As originally promulgated in 1918, Section 10 of the Uniform Fraudulent Conveyance Act provided, "[w]here a conveyance made or obligation incurred is fraudulent as to a creditor *whose claim has not matured, he may proceed* in a court of competent jurisdiction *against any person whom he could have proceeded had his claim matured*."[88] Justice Cardozo interpreted this language to "abrogate the ancient rule whereby a judgment and a lien were essential preliminaries to equitable relief against a fraudulent conveyance."[89] In doing so, he observed, "the act is explicit that a creditor may now maintain a suit in equity to annul a fraudulent conveyance, though his debt has not matured."[90]

---

[87] *Akanthos*, 770 F. Supp. 2d at 1334–35 (holding that a plaintiff has pled a cognizable harm that "consist[s] of a diminution in the value of the assets of the debtor's estate remaining available to creditors") (internal citation omitted).

[88] UNIFORM FRAUDULENT CONVEYANCE ACT § 10 (NAT'L CONFERENCE OF COMM'RS ON UNIF. STATE LAWS 1918) (Pls.' Compendium at tab 3); *Getty Ref. & Marketing Co. v. Park Oil, Inc.*, 385 A.2d 147, 149 n.2 (Del. Ch. 1978) (quoting Section 10).

[89] *Am. Sur. Co. of N.Y. v. Conner*, 251 N.Y. 1 (1929).

[90] *Am. Sur.*, 251 N.Y. at 7; James Angell McLaughlin, *Application of the Uniform Fraudulent Conveyance Act*, 46 HARV. L. REV. 404, 429, 438–39 (Jan. 1933) ("It is clear from the definition of 'creditor' in Section 1 and from the language of Section 10 that a contingent creditor is entitled to attack a fraudulent conveyance.").

In 1984, the Uniform Law Commission amended Sections 9 and 10 of the UFTA, which provided different remedies for creditors with matured and unmatured claims.[91] Both sections were consolidated into Section 7, titled "Remedies of Creditor."[92] Official Comment 1 to Section 7 expressly recognizes the rights of creditors "holding unmature claims":

> This section is derived from §§ 9 and 10 of the Uniform Fraudulent Conveyance Act. Section 9 of that Act specified the remedies of creditors whose claims have matured, and § 10 enumerated the remedies available to creditors whose claims have not matured. A creditor holding an unmatured claim may be denied the right to receive payment from the proceeds of a sale on execution until the claim has matured, but the proceeds may be deposited in court or in an interest-bearing account pending the maturity of the creditor's claim.[93]

Comment 4 further clarifies: "[a]s under the Uniform Fraudulent Conveyance Act, a creditor is not required to obtain a judgment . . . *or to have a matured claim* in order to proceed."[94] With this history in mind, I am satisfied the DUFTA *does* confer standing to Plaintiffs even though they have not yet suffered a denial of a claim or a refusal to pay a commission.

---

[91] UFTA § 7 cmt. 1–4; *see also* PETER A. ALCES, THE LAW OF FRAUDULENT TRANSACTIONS § 5:88 (2018) (Pls.' Compendium at tab 2).

[92] UFTA § 7.

[93] UFTA § 7 cmt. 1.

[94] UFTA § 7 cmt. 4 (citing *Am. Sur.*, 251 N.Y. at 1 (emphasis supplied)).

I am aware, as was Justice Cardozo, that allowing creditors with unmatured claims to bring claims under the Act may require the court to undertake the challenging exercise of assessing the present value of such claims. Creditors can only "set aside [a] conveyance to the extent necessary to satisfy his claim."[95] And setting the present value of an unmatured and contingent claim could prove to be "difficult."[96] But I will confront that challenge on another day; it is "enough for present purposes that the plaintiff has standing to challenge the conveyance."[97]

### 3. Plaintiffs' Legal Rights Have Not Been Extinguished

In their briefs, Defendants cite multiple cases involving plaintiffs who lack standing under fraudulent transfer laws because their status as a "creditor" either never existed in the first place or had been extinguished.[98] By way of example, Defendants cite *Infant Swimming Research, Inc. v. Faegre & Benson, LLP*.[99] That case involved the fraudulent release of a lien, but the lien's release did not confer standing because it was undisputed the lien secured an obligation that had been

---

[95] 6 *Del. C.* § 1307(a)(1); *Am. Sur.*, 251 N.Y. at 8.

[96] *Am. Sur.*, 251 N.Y. at 8.

[97] *Id.*

[98] *See* DOB at 31–32.

[99] 335 Fed. Appx. 707 (10th Cir. 2009).

paid.[100]   When the obligation was paid, the plaintiff's status as a creditor was extinguished.  Unlike *Infant Swimming*, there is no allegation here that Plaintiffs' policies, or the claims of the insurance agents, have been extinguished, satisfied or otherwise rendered unenforceable.[101]

The cases Defendants cite reveal that fraudulent transfer acts "create[] no substantive rights . . . [but] merely provide[] means for the application of assets of a debtor to the satisfaction of claims whose origin is elsewhere."[102]  But Plaintiffs are asserting claims "whose origins [are] elsewhere"—namely, their contracts with GLIC.  Unlike the cases Defendants cite, these substantive rights have not been

---

[100] *Id*. at 711.

[101] Other cases Defendants cite are likewise either distinguishable or they support Plaintiffs' arguments.  *See Jahner v. Jacob*, 515 N.W.2d 183 (N.D. 1994) (holding that a creditor loses her standing to bring a fraudulent transfer claim if an underlying statute extinguishes her legal rights against a debtor); *Enter. Fin. Gp., Inc. v. Podhorn*, 2018 WL 1745185, at *6 (E.D. Mo. Mar. 7, 2018), *rev'd,* 930 F.3d 946 (8th Cir. 2019) (holding, on appeal, that an alleged "economic harm" *is* "a concrete, non-speculative injury" even if a court has not yet entered a judgment in plaintiffs' favor).  In *Barry v. Brian*, 2017 WL 5973352, at *2 (D. Minn. Mar. 31, 2017), a wife claimed she had standing to sue under a fraudulent transfer statute because she had a "pre-distribution interest" in marital property while a property division lawsuit (dividing her and her husband's property) was pending. The court held she did not have any separate title to the property that her husband had transferred before the divorce.  Consequently, she could not bring a fraudulent transfer action against her husband for transferring marital property while the property division suit was still pending. *Id.*

[102] *Blumenthal v. Blumenthal*, 21 N.E.2d 244, 247 (Mass. 1939).

extinguished, whether by statute of limitation,[103] state laws concerning exempt property,[104] or otherwise.[105]

* * * * *

I am satisfied Plaintiffs have standing to bring their claims. That standing is expressly conferred by the DUFTA. Whether those claims are legally or factually viable remains to be seen.

---

[103] *See, e.g.*, *Jahner*, 515 N.W.2d at 185; *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003).

[104] *See, e.g.*, *In re Kimmel*, 131 B.R. 223, 229 (Bankr. S.D. Fla. 1991).

[105] *See, e.g.*, *Akanthos Capital Mgmt. v. CompuCredit Hldgs. Corp.*, 677 F.3d 1287 (11th Cir. 2012) (holding that a contractual "no-action clause" can bar creditors from bringing a fraudulent conveyance action); *John Deere Shared Servs., Inc. v. Success Apparel LLC*, 2015 WL 6656932, at *4 (S.D.N.Y. Oct. 30, 2015) (holding that creditor's status was effectively extinguished because it was undisputed the creditor was subordinate to secured creditors and the debtor's assets could not satisfy the secured creditors' interests); *Fid. Nat'l Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 845 (2009) (same); *RRR, Inc. v. Toggas*, 98 F. Supp. 3d 12, 22 (D.D.C. 2015) (holding that when a judgment has been "extinguished" because of a 10-year delay, it is no longer a valid debt and cannot serve as the substantive basis for a fraudulent transfer action); *Kraft Power Corp. v. Merrill*, 981 N.E.2d 671, 681–82 (Mass. 2013) (holding that where a contractual cause of action was not extinguished by the death of a party, it could serve as the substantive predicate for a fraudulent transfer action); *Terry v. Belfort*, 70 A.D.3d 1028 (N.Y. App. Div. 2010) (holding that a fraudulent transfer action was barred by court order as a part of a settlement); *Carr v. Guerard*, 616 S.E.2d 429, 430 (S.C. 2005) (holding that an expired judgment cannot support a fraudulent transfer action).

27

## B. Laches

Defendants argue that Plaintiffs' claim seeking to reverse GLIC's 2012, 2013 and 2014 Dividends is untimely.[106] According to Defendants, these Dividends, totaling $395 million, were all paid before September 21, 2014 (the "2012–14 Dividends").[107] The Complaint was filed on September 21, 2018.[108] Thus, Defendants argue, the challenge to the 2012–14 Dividends is untimely under the DUFTA's statute of limitations.[109] And tolling is unavailable here since Plaintiffs were on inquiry notice of the 2012–14 Dividends no later than February 2017.[110]

At the outset, I note (i) Delaware law governs procedural matters, (ii) statutes of limitations are procedural laws and (iii) when it is "clear from the face of the complaint" that claims are time barred, this court may dismiss untimely claims under

---

[106] DOB at 40–41.

[107] *Id.* Plaintiffs do not contest that the 2012–14 Dividends were paid by September 21, 2014, more than 4 years before the filing of the Complaint. *See* Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("PAB") (D.I. 27) at 20, 24, 29, 32, 36 (challenging Defendants' timeliness arguments on other grounds).

[108] *See* Verified Class Action Compl. (D.I. 1) (e-filed Sept. 21, 2018 11:43 a.m.).

[109] 6 *Del. C.* § 1309 (setting a 4 year statute of limitations for claims brought under Sections 1304(a)(1) & (a)(2) and 1305(a)).

[110] DOB at 44, 46–52; 6 *Del. C.* § 1309 ("A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought (1) under § 1304(a)(1) [(*i.e.,* actual fraudulent transfers)] of this title, within 4 years after the transfer was made . . . or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant.").

28

Court of Chancery Rule 12(b)(6), even when applying a laches analysis.[111] After carefully considering the parties' arguments, I am satisfied Plaintiffs' claims seeking reversal of the 2012–14 Dividends are untimely under the DUFTA's plain language.

### 1. The Laches Standard

Plaintiffs seek to reverse the Dividends on grounds they were both actual and constructive fraudulent transfers.[112] Under the DUFTA, such claims must be brought "within 4 years after the transfer was made."[113] While constructive fraudulent transfer claims are *not* subject to statutory tolling,[114] actual fraudulent transfer claims can be subject to tolling under the statutorily codified discovery rule.[115] Under this rule, actual fraudulent transfer claims expire (i) after four years

---

[111] *In re Sirius XM*, 2013 WL 5411268, at *4–7 (Del. Ch. Sep. 27, 2013); *In re Coca-Cola Enters., Inc. S'holders Litig.*, 2007 WL 3122370, at *5–7 (Del. Ch. Oct. 17, 2007) ("As this Court has stated time and time again, when the allegations of a complaint show the action was commenced too late, a defendant may properly seek dismissal under the statute of limitations or the doctrine of laches."); *Seiden v. Kaneko*, 2015 WL 7289338, at *9 (Del. Ch. Nov. 3, 2015) (partially granting a Motion to Dismiss under 12(b)(6) after performing a laches analysis).

[112] Compl. ¶¶ 141–53.

[113] 6 *Del. C.* § 1309(1), (2).

[114] *Compare* 6 *Del. C.* § 1309(1) ("A cause of action is extinguished unless action is brought . . . under § 1304(a)(1) . . . within 4 years . . . or, if later, within 1 year after the transfer . . . could reasonably have been discovered."), *with* 6 *Del. C.* § 1309(2) ("A cause of action is extinguished unless action is brought . . . under § 1304(a)(2) . . . within 4 years.").

[115] 6 *Del. C.* § 1309(1).

"or, [(ii)] if later, within 1 year after the transfer or obligation was or could have been discovered by the claimant."[116]

The parties agree that laches, rather than a common law statute of limitations paradigm, is the appropriate orientation by which to assess the timeliness of Plaintiffs' dividend claims.[117] Laches has two forms: a "traditional form," applied where the claim sounds purely in equity, and a separate form where "a statute of limitations exists for an analogous action at law."[118] Under a traditional laches analysis, the burden is on a defendant to establish (i) that the plaintiff unreasonably delayed in bringing her claim and (ii) that it was prejudiced by the plaintiff's failure to bring its suit sooner.[119] But when, as here, a statute of limitations period governs the claims, this court "will typically apply the applicable statute of limitations by analogy."[120] And "absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statute of limitations

---

[116] 6 *Del. C.* § 1309(1).

[117] PAB at 20; DOB at 40.

[118] *U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); *see also Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 (Del. Ch. Feb. 25, 2014).

[119] *Whittington v. Dragon Gp., L.L.C.*, 2010 WL 692584, at *5 (Del. Ch. Feb. 15, 2010); *U.S. Cellular*, 677 A.2d at 501.

[120] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 2012 WL 3201139, at *15 (Del. Ch. Aug. 7, 2012).

[has run]."[121] This approach makes sense because "after the statute of limitations has run, defendants are entitled to repose and are exposed to prejudice as a matter of law by a suit [initiated] by a late-filing plaintiff."[122]

Plaintiffs' cause of action accrued when GLIC paid the 2012–14 Dividends, unless there is a basis to toll accrual.[123] Here, that accrual date was sometime *before* September 21, 2014.[124] Accordingly, Plaintiffs were required to file their Complaint by the later of (i) September 21, 2018 or (ii) until "1 year after the [2012–14 Dividends were] or could reasonably have been discovered."[125] Plaintiffs'

---

[121] *U.S. Cellular*, 667 A.2d at 502; *Cent. Mortg.*, 2012 WL 3201139, at *15 ("The statute of limitations for a claim essentially provides the outermost limit for a plaintiff, filing in Chancery, to bring a claim, with laches typically acting to require even earlier filing."); *Petroplast Petrofisa Plasticos S.A. v. Ameron Int'l Corp.*, 2012 WL 3090935, at *12 n.103 (Del. Ch. July 31, 2012) ("The general rule is that absent a tolling of the limitations period, a party's failure to file within an analogous statute of limitations, if any, is typically conclusive evidence of laches."); *de Alder v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013) ("The Court does not need to engage in a traditional laches analysis for a presumptively late complaint.").

[122] *In re Sirius XM*, 2013 WL 5411268, at *4.

[123] 6 *Del. C.* § 1309; *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) (internal citation omitted).

[124] Plaintiffs do not dispute that the 2012–14 Dividends were paid before September 21, 2014. *See* PAB at 20–45 (raising other arguments).

[125] 6 *Del. C.* § 1309(1), (2); *Pereyron v. Leon Constantin Consulting, Inc.*, 2004 WL 1043724, at *1 (Del. Ch. Apr. 29, 2004) (applying a similar analysis).

31

Complaint filing missed the four-year deadline, so they must rely on tolling to escape dismissal of their otherwise untimely claims.[126]

Under the inquiry notice standard, Plaintiffs were required to file their claims no more than one year after "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury" to file their claim.[127] This standard "does *not* require 'actual discovery'" *or* "awareness of all the aspects of the alleged wrongful conduct," but only that Plaintiffs "should have discovered the general fraudulent scheme."[128]

Even after drawing all reasonable inferences in Plaintiffs' favor, the key facts that would cause Plaintiffs to "suspect wrongdoing" were knowable no later than February 2017.[129] Before that date:

---

[126] *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (noting that the analysis for tolling under the DUFTA is the same as an inquiry notice analysis).

[127] *In re Dean Witter*, 1998 WL 442456, at *7 (emphasis in original).

[128] *Id.* (emphasis supplied). Plaintiffs are incorrect to focus on constructive fraudulent transfer when advancing their tolling argument. PAB at 37. Section 1309(1) (i.e., the section containing the discovery rule for actual fraudulent transfers) applies only to *actual*—not constructive—fraudulent transfers. Capitalization and solvency are not critical factors in assessing actual fraudulent transfers; those factors are implicated by constructive fraudulent transfer claims. But, again, constructive fraudulent transfer claims are *not* tolled by a discovery rule. *See* 6 *Del. C.* § 1309(2).

[129] *Pomeranz*, 2005 WL 217039, at *13.

32

- GLIC publicly reported that it was required to make both the 2014 and 2016 Adjustments, which increased its liabilities by more than $1 billion;[130]

- After the 2014 Adjustment, Genworth's stock price dropped by 55% and investors sued Genworth for *intentionally* "understating its reserves by material amounts";[131]

- Plaintiffs were then subjected to dramatic premium increases on their policies;[132]

- In its 2014 Form 10-K, Genworth disclosed that it was trying to isolate GLIC because GLIC faced "adverse developments in [the] . . . long-term care insurance business"; and[133]

- In its 2016 Form 10-K, Genworth announced it had a strategic objective of "separat[ing] [and] isolat[ing], through a series of transactions, our long-term care insurance business from our other U.S. life insurance businesses" (collectively, the "red flags").[134]

To the extent Genworth had a plan to bail out the sinking ship by siphoning funds from GLIC's floundering business, the above-bulleted red flags were more than enough to cause suspicion. Even if Plaintiffs needed expert help to decipher GLIC's Statutory Financials, the red flags signaled all the major ingredients for

---

[130] Compl. ¶¶ 70–75.

[131] Compl. ¶¶ 72–73.

[132] Compl. ¶ 88.

[133] Compl. ¶¶ 113–14.

[134] Compl. ¶¶ 116, 120.

Genworth's alleged plan that would be needed for a policyholder or agent to pursue that expert guidance.[135] Viewing the pled facts most favorably for Plaintiffs, the 2014 and 2016 Adjustments and a plummeting stock price betrayed that GLIC was not as healthy as the Statutory Financials let on.[136] Genworth openly announced an intent financially to isolate GLIC, and the dramatic premium increases hinted at a desperate attempt to right the sinking ship.[137] Plaintiffs' Complaint, filed in September 2018, is untimely because it was filed more than one year after February 2017, when the general fraudulent scheme motivating the 2012–14 Dividends "was or could reasonably have been discovered."[138]

---

[135] *See* Compl. ¶¶ 70–75, 88, 113–14, 116. Plaintiffs argue they were not on notice until they learned of a 2018 letter GLIC wrote to one of its state regulators. Plaintiffs say this letter was GLIC's first admission "in plain words that its purported solvency depends entirely on massive and unprecedented rate increases." PAB at 23 (citing Compl. ¶ 93). I disagree. *First*, the relevant inquiry under 6 *Del. C.* § 1309(1) is Genworth's *fraudulent intent* and not its insolvency. *Second*, such a holding would equate inquiry notice with "actual knowledge"—which contradicts Delaware law. *See In re Dean Witter*, 1998 WL 442456, at *7 ("Inquiry notice does *not* require *actual* discovery.").

[136] Compl. ¶¶ 70–75.

[137] *See* Compl. ¶¶ 88, 113–14, 116; *see also State Farm*, 834 F. Supp. 2d at 306–07 (applying Pennsylvania's fraudulent transfer law and concluding that "the relevant inquiry is not plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff") (internal citations and quotations omitted).

[138] 6 *Del. C.* § 1309(1).

Plaintiffs argue that this conclusion saddles long-term care insurance consumers with an unreasonably heavy burden.[139] They say it imposes upon these consumers an obligation to "continually monitor and review SEC and state insurance-department filings to assess the financial condition of their insurers" and "collect, analyze, and understand statutory financial statements."[140] Again, I disagree. *First*, I have not applied the kind of "super-consumer" standard that Plaintiffs describe.[141] I have, instead, focused on the date by which the undisputed facts reveal Plaintiffs should have seen enough smoke to "suspect wrongdoing" and

---

[139] PAB at 38–41 (citing *Smith v. Mattia*, 2010 WL 412030, at *5 (Del. Ch. Feb. 1, 2010)).

[140] *Id.* at 39 (emphasis supplied).

[141] *Cf. Ryan v. Gifford*, 918 A.2d 341, 345–36 (Del. Ch. 2007) ("[R]easonable diligence . . . does not require a shareholder to conduct *complicated statistical analysis* in order to uncover alleged malfeasance.") (emphasis supplied); *Weiss v. Swanson*, 948 A.2d 433, 452 (Del. Ch. 2008) ("It would be inappropriate to infer . . . that [plaintiff] was on inquiry notice of his claims . . . [because] in order to discover the alleged [wrongdoing], . . . [plaintiff] would have had to cull through the company's Form 4s each timed they were filed, compare the grant dates of the options with the timing to the quarterly earnings releases, and then *conduct a statistical analysis*. . . . Such an investigation is beyond "reasonable" diligence.") (emphasis supplied). Here, Plaintiffs allege Genworth openly announced a plan to "separate, then isolate" GLIC. Compl. ¶ 116. No "statistical analysis" was required to uncover Genworth's alleged plan.

then ask for help.[142] *Second*, I have simply followed the General Assembly's direction "to bar claims after the stated time."[143]

## 2. Equitable Principles Do Not Toll the Statutory Period

Plaintiffs argue the statute of limitations under 6 *Del. C.* § 1309 should be extended by four years from the date of imputed discovery, and not one year, because under equitable tolling principles, the DUFTA's entire four-year statutory period does not begin to run until the date of imputed discovery.[144] This same argument was analyzed and rejected by this court in a thoughtful opinion by former Chancellor Chandler.[145] In *Pereyron*, the court applied the statutory period set forth in Section 1309(1) by measuring one year from when "the conveyance could reasonably have been discovered."[146] The court then clarified, "[t]he plain language of Section 1309 does not allow this Court to permit 'equitable tolling' over and above the tolling period explicitly contained in the statute . . . because the

---

[142] *Pomeranz*, 2005 WL 217039, at *13; *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at *5 (Del. Ch. Feb. 28, 2006) (holding that claims were time barred when the plaintiff "could have reviewed the TransAir 10K [when it was released] or at any time from then through 2003 and learned the same information that caused him to file this lawsuit in 2005[]").

[143] *Pereyron*, 2004 WL 1043724, at *2.

[144] *See* PAB at 29–30.

[145] *Pereyron*, 2004 WL 1043724, at *1.

[146] *Id.*, at *2.

General Assembly has evinced its intent to bar claims filed after the stated time."[147]

Because the action was filed after the period specified in Section 1309, the court was obliged to dismiss the complaint.[148]

Plaintiffs assert that "unusual conditions or extraordinary circumstances" could merit a deviation from the expressly provided limitations period in 6 *Del. C.* § 1309.[149] In the right case, that may well be. But, in my judgment, this is not such an *unusual* or *extraordinary* case.[150] For the reasons stated above, I find the red flags were enough to put Plaintiffs on inquiry notice no later than February 2017. Accordingly, I see no basis in equity to ignore the plain language of the DUFTA's express tolling provision.

## III.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED regarding the $395 million in Dividends GLIC paid from 2012 to 2014. Any challenge to those Dividends is untimely under 6 *Del. C.* § 1309. Defendants'

---

[147] *Id.*

[148] *Id.*, at *3.

[149] PAB at 26–29 (citing *IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177–78 (Del. 2011) (holding that under "unusual conditions or extraordinary circumstances" it may be "inequitable" to rigidly apply a statute of limitations and, in such cases, [the Court of Chancery] will not be bound by the statute")).

[150] *See IAC/InterActiveCorp*, 26 A.3d at 178 (instructing the Court of Chancery to "exercise its discretion, after considering all relevant facts" when making such a determination).

motion is DENIED to the extent it challenges Plaintiffs' standing to bring this lawsuit.

**IT IS SO ORDERED.**